IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| **(1)FRANCES HARVEY**, ADMINISTRATRIX OF THE ESTATE OF EARLENE FRANCES HARVEY, DECEASED, | ) ) ) ) ) |
| Plaintiff, | ) ) |
| | ) 6:14-cv-00219-RAW |
| vs. | ) ) ) |
| **(1) LUIS V. GOROSPE, M.D.;** **(2) WAGONER HOSPITAL AUTHORITY**, d/b/a **WAGONER COMMUNITY HOSPITAL**; (3) **QUORUM HEALTH RESOURCES, L.L.C.;** (4) **JOHN DOES I-X** and (5) **JANE DOES I-X,** | ) ) ) ) ) ) ) ) ) |
| Defendants. | ) |

### WAGONER COMMUNITY HOSPITAL'S
### MOTION TO QUASH PLAINTIFF'S RULE 30(B)(6)
### NOTICE TO TAKE DEPOSITION OF CORPORATE REPRESENTATIVE

COMES NOW the Defendant, Wagoner Community Hospital ("Wagoner" or "WCH"), by and through its counsel of record, Jason C. Rush and Grant A. Fitz, of the law firm of Rodolf & Todd, and hereby submits its *Motion to Quash Notice of Deposition of Corporate Representative*, respectfully requesting that this Court enter an Order quashing Plaintiff's *Notice* as set forth herein. In support of this *Motion*, Wagoner would show the Court as follows:

1

## STATEMENT OF THE CASE

Plaintiff brought this suit against Wagoner Hospital Authority, d/b/a Wagoner Community Hospital, Quorum, and Dr. Luis V. Gorospe, alleging that these entities provided substandard medical care to Earlene Harvey on or about November 13, 2012. Hospital maintains that the care provided to Ms. Harvey was appropriate and within the standard of care. Ms. Harvey underwent gastric bypass procedure performed by Dr. Gorospe at Wagoner. Unfortunately, Ms. Harvey experienced serious but known complications as a result of the surgery. She was eventually transferred to Saint Francis Hospital on November 20, 2012 and passed away on December 31, 2012.

Plaintiff also claims that WCH was negligent in granting privileges to Dr. Gorospe. On April 29, 2015, Plaintiff sent a letter to counsel for WCH stating that he wanted to depose a corporate representative and identifying broad subject areas he wanted to cover in the deposition. (Letter, Exh. "A"). WCH counsel responded with a letter asking for more clarification of the categories of information sought and explaining that a great deal of the information identified was privileged and/or not discoverable as a result of the peer review statute. (Letter, Exh. "B"). Plaintiff's counsel's response narrowed the issues on two categories, but still failed to acknowledge that much of the information sought was privileged and/or narrow to the appropriate time frame. (Letter, Exh. "C"). On May 7, 2015, Plaintiff filed a notice to take Wagoner's corporate representative deposition on May 19, 2015, notwithstanding counsel for WCH had informed him previously that he was going to be in trial on that date. (Notice, Exh. "D"). Counsel did ultimately agree to another date for the deposition, specifically May 27, 2015. However, counsel for Wagoner has since informed Plaintiff's counsel that due

to scheduling conflicts, May 27, 2015 would not work for the date of the deposition because counsel for Wagoner has not had an opportunity to fully investigate the best corporate representative to provide testimony on the issues, subject to the ruling of this Court on this Motion. (Email, Exh. "E"). Counsel for Wagoner provided alternative dates of June 4 or 5, 2015 as possible new deposition dates, but despite those attempts at resolving the conflict, Plaintiff's counsel would not agree to a one week extension.

Regardless, WCH intends to produce a corporate representative for deposition; however, as set forth in the letter to Plaintiff's counsel on May 4, 2015, and as shown below, WCH objects to certain deposition topics and to the date of Notice and requests the Court quash the same.

## ARGUMENTS AND AUTHORITIES

### I.   MUCH OF THE INFORMATION PLAINTIFF SEEKS IS PRIVILEGED.

"Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense. . . ." Rule 26(b)(1) Fed.R. Civ. Pro. Discovery is only permitted for "relevant information and the discovery must appear[] reasonably calculated to lead to the discovery of admissible evidence . . . ." *Murphy v. Deloitte & Touche Group Ins. Plan*, 619 F.3d 1151, 1163 (10th Cir. 2010). "Plainly, the scope of discovery is broad, but not unlimited. The basic positive touchstone is relevance, including the reasonable possibility that the information sought would lead to admissible evidence. One fundamental limit is privilege." *Reeg v. Fetzer*, 78 F.R.D. 34, 36 (W.D. Okla. 1976).

### A.   OKLAHOMA PEER REVIEW PRIVILEGE.

According to Oklahoma law, peer review information "shall be private, confidential, and privileged." OKLA. STAT. tit. 63 § 1-1709.1(B)(1) (2014). The "peer review process" is defined as "any process, program, or proceeding, <u>including a credentialing or recredentialing process</u>, utilized by a healthcare facility or county medical society to assess, review, study, or evaluate the credentials, competence, professional conduct or healthcare services of a healthcare professional." OKLA. STAT. tit. 63 § 1-1709.1(A)(6)(emphasis added).

"Peer review information" means "all records, documents, and other information generated during the course of a peer review process, including any reports, statements, memoranda, correspondence, record of proceedings, materials, opinions, findings, conclusions, and recommendations . . . ." OKLA. STAT. tit. 63 § 1-1709.1(A)(5). Peer review information is to remain private, confidential, and privileged. OKLA. STAT. tit. 63 § 1-1709.1(B)(1). Only specific, limited documents are discoverable and only when, as here, where a patient or patient's representative has filed a medical negligence lawsuit against the doctor or the hospital at issue. OKLA. STAT. tit. 63 § 1-1709.1(C) and (D).

While 63 O.S. § 1-1709.1 allows for limited discovery in connection with claims of corporate negligence, it is only allowed with respect to a specific and limited subset of peer review information and/or documents. Only "… the [1] credentialing and recredentialing data, and [2] the recommendations made and action taken as a result of any peer review process utilized by such health care facility regarding the health care professional *prior to the date of the alleged negligence* shall be subject to discovery pursuant to the Oklahoma Discovery Code." 63 § 1-1709.1(D)(1) . *(*emphasis added).

"Credentialing or recredentialing data" is defined as and limited to: (1) the application submitted by the physician requesting appointment or reappointment to the medical staff; (2) any information submitted by the physician in support of his application; (3) **any information**, **not otherwise privileged**, obtained by the hospital during the credentialing/recredentialing process regarding such application; and (4) the decision made by the hospital regarding such application. *Id*. at § 1-1709.1(A)(1)(a)-(d).

### B.   PEER REVIEW PROTECTION ALLOWS FOR CANDID DISCUSSIONS TO IMPROVE HEALTH CARE.

The reason for protecting the discovery of such information is to ensure the purpose of the peer review statute is fulfilled. The peer review process was designed to improve the quality of health care "through an open exchange of information and opinions." Marty G. Cain, *Oklahoma's New Peer Review Statute*, Oklahoma Bar Journal vol. 70, No. 38, Oct. 23, 1999 p. 1.[1] It was intended to be a vehicle for which there could be candid, voluntary and constructive evaluations of a physician's performance in rendering health care. *Id*. Additionally, a Maryland district court provided that the peer review statute:

> . . . does not require that a formal committee identify the mistakes of health care providers. Nor does it require that the person who presents the mistakes be the person who speaks with the individuals who made them. The statute's primary purpose is to ensure that the proceedings of medical review committees dedicated to the improvement of health care through the evaluation of past care remain confidential, so that health care professionals will feel free to criticize a colleague's work without fear of entanglement in litigations as a result.
> . . .
> [P]hysicians are frequently reluctant to participate in peer review evaluations for fear of exposure to liability, entanglement in malpractice litigation, loss of referrals from other doctors, and a variety of other reasons. . . . Recognizing that effective review of medical care requires

---

[1] Attached as Exhibit "E".

5

> candid as well as objective communication, the legislature enacted the privilege to combat such reluctance.

*Brem v. DeCarlo, Lyon, Hearn & Pazourek, P.A.*, 162 F.R.D. 94, 97, 100 (D. Md. 1995).

Furthermore, the Illinois Supreme Court in *Jenkins v. Wu*, 468 N.E.2d 1162, 1168 (Ill. 1984) recognized the purpose of a peer review process as follows:

> [T]he purpose of this legislation is not to facilitate the prosecution of malpractice cases. Rather, its purpose is to ensure the effectiveness of professional self-evaluation, by members of the medical profession, in the interest of improving the quality of health care. The Act is premised on the belief that, absent the statutory peer review privilege, physicians would be reluctant to sit on peer review committees and engage in frank evaluations of their colleagues.

*Id*. The idea of having a peer review statute is to protect "substantive exchanges that transpire during the course of a peer review meeting." *Bracket v. St. Mary's Hosp.*, 2002 WL 241375 *4 (Conn. Super. 2002).

### C. PLAINTIFF SEEKS INFORMATION REGARDING CREDENTIALING OF OTHER PHYSICIANS, PRIVILEGED INFORMATION NOT SUBJECT TO DISCOVERY (NOTICE #13).

Oklahoma law is clear that any information about specific credentialing or peer review of any other physician other than Dr. Gorospe is not discoverable at all. Plaintiff has not identified any other physician as allegedly negligent or named a credentialing claim. Therefore, none of the exceptions to the peer review privilege apply as to any other physician. Any other physician's credentialing file and all peer review information contained therein is private, confidential, and privileged.

As to #13, Plaintiff wants to depose the corporate representative as to "the doctors and qualifications of doctors cross-covering Dr. Gorospe's bariatric surgery patients." (Notice, Exh. "D") It is unclear what information Plaintiff is seeking. If he simply wants to know the doctors on staff and their area of expertise, a corporate representative can

6

discuss that information. However, the Notice seems to indicate that Plaintiff wants to depose the witness as to the credentials and/or credentialing as to the doctors cross-covering Dr. Gorospe's bariatric patients. Because Plaintiff has not alleged a negligent credentialing claim against any physician besides Dr. Gorospe, that information is privileged and not discoverable.

### D. ANY PEER REVIEW INFORMATION THAT POSTDATES THE SURGERY DATE IS PRIVILEGED, AND THOSE INVOLVED IN THE PEER REVIEW PROCESS ARE FORBIDDEN FROM TESTIFYING ABOUT THE PROCESS (NOTICE #5, # 7, #8, #10).

Likewise objectionable is Plaintiff's request #5. According to the Notice, Plaintiff wants to depose the corporate representative as to the history of Dr. Gorospe, including any medical malpractice actions or allegations involving Dr. Gorospe. First, it should be noted any that any medical malpractice actions would be a matter of public record, equally available to Plaintiff. Second, the only history that is relevant to the credentialing claim is any that predates Mrs. Harvey's surgery.

Third, Paragraph E of the peer review statute provides **"no person involved in a peer review process may be permitted or required to testify regarding the peer review process in any civil proceeding or disclose by responses to written discovery requests any peer review information."** 63 O.S. § 1-1709.1(E) (emphasis added). To the extent this information was obtained during the course of the peer review process, and also to the extent Plaintiff is seeking to depose someone involved in the peer review process about the peer review process (Notice #5, #7), the Notice is objectionable.

Some states with similar provisions to paragraph (E) have further interpreted the permitted scope of discovery of peer review information during depositions. For example, in the case of *Brem, M.D. v. Drs. Decarlo, Lyon, Hearn & Pazourek*, 162

7

F.R.D. 94, 96 (D.Md. 1995), a resident physician filed an action against the professional association of radiologists on claims of race and sex discrimination and defamation arising from her discharge. The issue in that case was whether a physician's opinion regarding the competence of a former resident was discoverable under the state's peer review statute when the physician's opinion was based on information he acquired during the review of the resident's performances. *Id*.

The Court held the physician's opinion regarding the competence of a former resident was not discoverable under the peer review statute when the physician's opinion was clearly based upon information he acquired in his capacity as administrator of the hospital's error management conferences, which involved the review of residents' performances. *Id.* at 100-101. Thus, the Court denied the motion to compel such deposition. However, the Court pointed out that does not mean that *all* opinions held by the physician were protected from discovery. *Id*. at 100. Specifically, the Court stated that:

> An opinion derived from information or knowledge obtained independent of the error management conferences would not be covered by statute. . . . For example, a physician who personally witnessed Dr. Brem's work at Johns Hopkins and formed an opinion regarding her competence as a result thereof would be permitted to testify as to that opinion regardless of whether the information on which it is based also was reviewed in an error management conference.

*Id*. at 100-101. Since the physician in that case testified he had no such personal or independent knowledge, his opinions were protected by the peer review statute. *Id.* at 101; see also *Munroe Regional Medical Center v. Rountree*, 721 So.2d 1220, 1223 (holding that while a witness may be required to testify as to what he or she saw or heard during surgery, he could not be required to testify as to what was told to the peer review

committee), see also Marty G. Cain, *Oklahoma's New Peer Review Statute*, Oklahoma Bar Journal vol. 70, No. 38, Oct. 23, 1999. pp. 4-5 (stating the patient may discover the identity of individuals who have personal knowledge of the facts) (Exh. "F").

Consequently, although Defendant <u>does not object</u> to Plaintiff seeking information outside the scope of the peer review privilege or other privileges, Defendant <u>does object</u> to Plaintiff questioning the corporate representative about peer review information that is privileged that was obtained during the course of a peer review process.

As to #7, Plaintiff wants to depose the corporate representative as to "The investigation and results of any investigation respecting the competence of Dr. Gorospe before he was granted staff privileges." (Notice, Exh. "D")  Again, to the extent the person he deposes is involved in the peer review process, he or she is restricted from testifying about the process.  Moreover, some of the documents involved in any such investigation may be privileged as well.  Finally, the only relevant time frame for discovery as to these topics is any recommendation made or action taken prior to the surgery in question.  Any recommendations made or action taken prior to Mrs. Harvey's surgery could be discussed by the corporate representative, but not the peer review process of any investigation itself.

Plaintiff's item #8 on the Notice is "the number and outcomes of bariatric surgeries, including Roux-En-Y Gastric Bypass surgeries at Wagoner Community Hospital." (Notice, Exh. "D")  While the number of surgeries is something the corporate representative would be prepared to address, the outcomes of any other patient is not.  If there has been a quality study of bypass surgery outcomes, such information is privileged

peer review under 63 O.S. § 1-1709.1.  Similarly, if there has been a morbidity and mortality study, it would be privileged information under 63 O.S. § 1-1709.  Any other patient's medical records would be protected by HIPAA.  And finally, under the Health Care Quality Improvement Act, if reports were made regarding gastric bypass surgeries as required under the Act, this information would be privileged as well.

Again, Plaintiff is seeking the production of privileged and confidential patient protected health information. Moreover, many of these surgeries post-date Plaintiff's surgeries.  Thus, they would have no bearing on whether Wagoner properly credentialed Dr. Gorospe with the information it had prior to Plaintiff's surgeries. Other surgeries, based on other patient's presentations and circumstances, would offer nothing of value to the issues of negligence or credentialing in this case, and would, in fact, beget a trial within a trial as to whether those procedures were properly performed.

Under topic #9, Plaintiff wants to question the corporate representative as to any instance of misconduct by Dr. Gorospe or behavior that was questioned by Wagoner Community Hospital.  This topic is similar to #5 as to Dr. Gorospe's history and #7 as to any investigation of Dr. Gorospe's competence before he was granted privileges.  As stated previously, any recommendation made or action taken as to Dr. Gorospe prior to the date of the surgery would be discoverable and any credentialing that is not otherwise privileged; however, any discussion of peer review activities prior to that date that were privileged or after that date are not.

As to Plaintiff's #10, "All efforts undertaken by Wagoner Community Hospital to monitor the performance of Dr. Gorospe," this could well encompass focused professional practice evaluation (FPPE) and ongoing professional practice evaluation

10

(OPPE). This is statistical ongoing professional practice evaluation data and is likewise privileged. The Joint Commission for the Accreditation of Hospitals mandated each hospital to develop focused professional practice evaluation (FPPE) and ongoing professional practice evaluation (OPPE) policies and implement them as of January 1, 2008. Joint Commission requires hospitals to collect and distribute to physicians specific data regarding the core competencies and quality improvement that are OPPEs.  FPPEs are used when a current physician staff member requests new/additional privileges or there is potential clinical concern requiring closer monitoring identified through OPPE requiring focused peer review.

Both OPPE and FPPE are considered peer review and maintained in the peer review file. According to the Joint Commission, the intent is that organizations look at data on performance for all practitioners on an ongoing basis rather than at the two year reappointment process, to allow them to take steps to improve performance on a more timely basis.  These two forms of evaluation also fall under the definition of a "**Peer review process:**"

> means **any process**, program or proceeding, **including a credentialing or recredentialing process**, utilized by a health care facility . . . to assess, review, study or evaluate the credentials, competence, professional conduct or health care services of a health care professional.

63 O.S. § 1-1709.1(A)(6)(emphasis supplied).  OPPE and FPPE are "processes utilized by the hospital to assess and evaluate the competence and health care services of the health care professional." This information is privileged under the statute: "Peer review information shall be private, confidential and privileged. . . . "   § 1-1709.1 (B)(1), as OPPE and FPPE constitute peer review information generated during the course of a peer review process. § 1-1709.1(A)(5).

11

## II.   INFORMATION REGARDING THE NATIONAL PRACTITIONER DATA BANK IS PRIVILEGED.

Dr. Gorospe's credentialing file contains documents from the National Practitioner Data Bank ("NPDB") that are protected by federal law and not subject to discovery or deposition testimony. In order to provide more incentive for physicians to engage in vigorous peer review, Congress passed the Health Care Quality Improvement Act "HCQUIA" and established the NPDB. The NPDB collects information on physicians from different sources, including hospitals and insurance companies. HCQIA requires "[e]ach entity which makes payment under a policy of insurance . . . or otherwise in settlement . . . of, or in satisfaction of a judgment in, a medical malpractice action or claim" to report the settlement information to the NPDB.  45 C.F.R. § 60.7.  State medical boards are also required to report if they revoke or suspend a physician's license based on unprofessional conduct. 45 C.F.R. § 60.8.  Additionally, hospitals are required to report when they revoke or suspend a physician's medical privileges. 45 C.F.R. § 60.9. Hospitals must also request information from the NPDB for each physician who applies for privileges or renewal.  45 C.F.R. §§ 60.10(a)(1)(2); 42 U.S.C. §11131(a).  The hospital is "presumed to have knowledge of any information reported" if the hospital fails to query the NPDB. 45 C.F.R.§ 60.10(b); 42 U.S.C. § 11131(b).

Information reported to or received from the NPDB is subject to the confidentiality clauses contained in both HCQIA and NPDB regulations. Section 11137(b) of HCQIA provides:

> Information reported under this [Act] is considered confidential and shall not be disclosed . . . except with respect to professional review activity . . . . information provided under [HCQIA] is intended to be used solely with respect to activities in the furtherance of the quality of health care.

12

Similarly, 45 C.F.R. § 60.13 also provides for the confidentiality of the NPDB materials.

> Information reported to the Data Bank is considered confidential and shall not be disclosed outside the Department of Health and Human Services, except as specified in § 60.10, § 60.11 and § 60.14.  Persons and entities which receive information from the Data Bank . . . must use it solely with respect to the purpose for which it was provided.

The plain language of HCQIA is clear.  Information reported under HCQIA may only be used in furtherance of quality health care, such as peer review processes. 42 U.S.C. § 11137(b)(3). Likewise, NPDB regulations require that any entity which receives information from the NPDB "must use it solely with respect to the purpose for which it was provided." 45 C.F.R. § 60.13.

There is one limited exception to this protection.  "An attorney or individual . . . who has filed a medical malpractice action or claim . . . against a hospital and who requests information regarding a specific health care practitioner who is also named in the action or claim" can obtain information from the NPDB "only upon the submission of evidence that the hospital failed to request information from the Data Bank" as required by HCQIA.  45 C.F.R. § 60.18.

This exception does not apply.  In fact, there is no such evidence showing that WCH failed to query the NPDB regarding Dr. Gorospe and as the Court is now aware, a privilege log has been provided to Plaintiff's counsel detailing the fact that the NPDB was queried. Therefore, the exception allowing disclosure of NPDB documents does not apply, and the documents in question retain their privileged and confidential status; therefore, the documents cannot be discussed and the Notice should be quashed to the extent it seeks this information.

**III.   PLAINTIFF'S NOTICE SEEKS INFORMATION THAT IS PROTECTED BY HIPAA (NOTICE #11).**

Under the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), "[a] covered entity or business associate may not use or disclose protected health information" except as permitted under certain circumstances. 45 C.F.R. § 164.502(a). Entities may release protected health information to an individual seeking their own personal medical records or pursuant to a valid HIPAA authorization. *Id.* at § 164.502 (a)(1). Additionally, covered entities may release protected health information, in the absence of an authorization, pursuant to a court order or pursuant to a:

> subpoena, discovery request or lawful process, that is not accompanied by an order of a court . . . if:
>
> (A) The covered entity receives satisfactory assurance . . . from the party seeking the information that reasonable efforts have been made by such party to ensure that the individual who is the subject of the protected health information that has been requested has been given notice of the request; or
>
> (B) The covered entity receives satisfactory assurance . . . from the party seeking the information that reasonable efforts have been made by such party to secure a qualified protective order that meets the requirements of paragraph (e)(1(v) of this section.

45 C.F.R. § 164.512 (e).

In this case, Plaintiff's Notice seeks information that may well involve other patients, such as #8, where he seeks to discuss the outcomes of bariatric surgeries at Wagoner, #9, any instances of misconduct, #11, examples of incompetent behavior, and #12, any report of any patients of Wagoner respecting Dr. Gorospe. (Notice, Exh. "D") This is so broad, that it encompasses medical records and patient information of

individuals who are wholly unrelated to this case. The health information of these individuals is protected from disclosure by HIPAA. Plaintiff's Notice does not comply with HIPAA and should be quashed in order to prevent the disclosure of third-parties' protected health information herein. Given the severe penalties imposed against hospitals for violations of HIPAA, exposing WHC to the risk of penalties for disclosure is unnecessary. Therefore, because Plaintiff did not comply with the federal requirements for the disclosure of protected health information, the Notice should be quashed.

### IV. PLAINTIFF'S NOTICE SEEKS INFORMATION THAT POSTDATES THE CARE IN QUESTION AND DOES NOT RELATE TO PATIENT CARE.

Under #12, Plaintiff wants to depose the corporate representative as to "Any reports of any staff, independent contractors, employees, or patients of Wagoner Community Hospital respecting Dr. Gorospe." (Notice, Exh. "D") This topic is overly broad and not limited in time or scope. If Plaintiff is seeking information regarding variance reports related to Dr. Gorospe's care prior to November 13, 2012, the corporate representative can discuss this narrow topic. If he seeks such information after the date in question, it is not discoverable. Moreover, to the extent he seeks information regarding reports about anything not related to patient care, such would not be calculated to lead to the discovery of admissible evidence. See *Reeg v. Fetzer*, 78 F.R.D. 34, 36 (W.D. Okla. 1976)

WHEREFORE, premises considered, it is respectfully submitted that the Court quash the Notice as to the privileged and undiscoverable information sought and for any other relief to which it is entitled.

Respectfully submitted,

/s/ Grant A. Fitz
Jason C. Rush, OBA# 20322
Grant A. Fitz, OBA#19806
RODOLF & TODD
2000 Mid-Continent Tower
401 South Boston Avenue
Tulsa, Oklahoma  74103
(918) 295-2100

*ATTORNEYS FOR DEFENDANT WAGONER HOSPITAL AUTHORITY D/B/A WAGONER COMMUNITY HOSPITAL*

## CERTIFICATE OF SERVICE

I hereby certify that on the 22nd day of May, 2015, I electronically transmitted the foregoing document to the Clerk of the Court using the ECF System for filing and transmittal of a Notice of an Electronic Filing to the following ECF registrants (names only are sufficient):

Robert Alan Rush, Esq. – rrush@loganlowry.com
E.C. Gilbreath, Esq. – attysatlaw@aol.com
Timothy G. Best, Esq. – tbest@bestsharp.com
Benjamin Reed, Esq. – breed@bestsharp.com

/s/ Grant A. Fitz