

# Oklahoma Bar Association
Serving the legal profession and the public since 1904

Current Issue   Home -- Bar Journal
Archived Issues
Board of Editors
Advertising Rates
Advertising Standards
Submissions
Reprint Permission
Subscriptions

Quick Links

General Public
Court Facts
Bar Admission
Lawyer Resources
Ethics & Professionalism
CLE
CLE Approval (MCLE)
Legal Research
News & Events
Find a Lawyer
MyOKBar
OBA-NET
OSCN

SIGN IN TO fastcase

ID
PIN

Sign in

Forgot your PIN?

**Oklahoma Bar Journal**
**Articles**

Vol. 70, No. 38, October 23, 1999

## Oklahoma's New Peer Review Statute

**By Marty G. Cain**

### Introduction

Peer review is generally a retrospective evaluation of medical care provided by a healthcare professional in a healthcare facility. This evaluation takes place at several different points. Peer review of a healthcare professional can occur on a continuous, random, categorized, or targeted basis.

Physicians have done peer review for years. The goal of peer review is to enhance the quality of medical care and treatment through an open exchange of information and opinions. It is intended to provide a healthcare professional with constructive comments, criticisms, and suggestions from his or her peers. It goes without saying that the free exchange of information and opinions can only occur in a protected setting.

On November 1, 1999, a new section of law, Section 1-1709.1 of Title 63 will go into effect. With notable exceptions, it makes certain records, documents, and other information generated during the course of a healthcare facility's peer review process private, confidential, and privileged. The impetus for the public policy found in this new legislation was the practical effect of a recent series of Oklahoma Supreme Court decisions addressing the legislative intent and scope of the privilege created by Title 63, Section 1-1709.1

It must be remembered that this new section of law does not repeal Title 63, Section 1-1709. The protections afforded by that section remain in effect and are not affected by the enactment of this new section of law.

### Background

The first case that addressed the intent and scope of the privilege created by Title 63, Section 1-1709 was *City of Edmond v. Parr*, 1978 OK 70, 587 P.2d. 56 (Okla. 1978). In *City of Edmond*, a child, while a patient in the Edmond Memorial Hospital in 1972, allegedly contracted a severe staphylococcus infection. The plaintiffs alleged the hospital was negligent in either failing to prevent the outbreak of the infection or failing to prevent its spread. The hospital maintained a standing committee to investigate the source of any infection originating within the hospital or the spread of any infection which may be brought into the hospital by a patient.

The respondent district judge ordered the production of certain records kept by the hospital's committee. In response to the hospital's request for a writ of prohibition, the Oklahoma Supreme Court held that the records kept by the Edmond Memorial Hospital Infectious Disease Control Committee came within the privilege set forth in Title 63, Section 1-1709.

For many years documents and information furnished to an in-hospital committee by reason of Title 63, Section 1-1709 were routinely withheld from production on the basis of the "peer review privilege." This routine practice was reviewed in *Wisdom v. McCall,*



OKLAHOMA LAWYERS
FOR AMERICA'S
HEROES




2013 OBA/CLE
FORM
BOOK




EXHIBIT
F

1998 OK 31, 956 P.2d 155. In *Wisdom*, a physician, who had previously had his clinical privileges revoked by a local nonparty hospital, was granted clinical privileges at the nearby defendant hospital. The plaintiffs argued they were entitled to discover certain documents and information in the defendant hospital's files related to the physician's experience at the other local hospital. The Court ruled that the provisions of Title 63, Section 1-1709 were not applicable to the staffing, credentials, and peer review records relating to the physician on the staff of the defendant hospital and did not protect and exempt them from discovery.

After *Wisdom*, plaintiffs began routinely requesting copies of a defendant physician's credentialing file and peer review files from the hospitals in which the physician practiced. In light of this case, most trial courts began ordering the production of these materials. Consequently, hospitals throughout the state began encountering difficulties in persuading members of their medical staffs to participate in required peer review activities. Rural hospitals with smaller medical staffs found it especially difficult to encourage physicians to participate in peer review programs.

Physicians could no longer be as candid as in the past because their statements, findings, and conclusions formed during the course of peer review activities would very likely be used in pre-trial and courtroom proceedings. In addition, participants in the peer review process were being subpoenaed to give depositions regarding the peer review process. As a result, concerns surfaced about how to effectively improve the quality of medical care for all Oklahomans without the benefit of a private, confidential, and privileged process.

On the other hand, attorneys seeking to protect the interest of their clients in ascertaining information about the course of their medical care and treatment rejoiced in the aftermath of the Court's ruling. The barriers to the discovery of this information had been removed.

The debate as to the most effective way to improve the quality of healthcare for all Oklahomans raged on, with patients, healthcare professionals, and healthcare providers aggressively presenting persuasive arguments for their respective positions. Due to the perceived uncertainty raised by *Wisdom*, many inconsistent approaches to the release of this type of information appeared among the various District Courts.

At the direction of House and Senate Leadership, representatives from the Coalition for Quality Patient Care and the Oklahoma Trial Lawyer's Association commenced negotiations during the past Legislative session in an effort to resolve these issues. The new statute represents the Legislature's overwhelming adoption of the statutory language created as a result of this process and the important protections it provides.

The following is an analysis of this new section of law and commentary regarding its intent and purpose from one of the individuals who was involved in the process of negotiating and drafting its language.

**Analysis and Commentary**

### I. What is a "peer review process"?

A "peer review process" means any process, program, or proceeding, including a credentialing process, utilized by a healthcare facility to assess, review, study or evaluate the credentials, competence, professional conduct or healthcare services of a healthcare professional.[2] The definition of a "healthcare facility" includes any licensed hospital or related institution and any licensed ambulatory surgical center. A "healthcare professional" means any licensed doctor, podiatrist, optometrist, chiropractor, psychologist, dentist, or person authorized to practice a dental specialty.

The definition of a "peer review process" is intended to be as broad and flexible as possible. The purpose is to cover any setting or protect any environment in which a peer review process takes place. There is no requirement that the review or evaluation be retrospective in nature. It may be concurrent with the provision of healthcare services. Also, the statute broadly encompasses any program or activity to evaluate healthcare services provided and is not limited in the scope of healthcare services to be evaluated.

The only restriction is that the process must be **utilized by** a healthcare facility. It is not necessary that a "peer review process" take place within the walls of a healthcare facility. Nor is it required that the participants in the process or the sponsor of the program be a healthcare facility. The statute does not require that the process be performed by a designated in-hospital committee or by members of the hospital's medical staff, although it is anticipated that most peer review processes will be conducted in this conventional manner.

The bottom line is that no matter who performs the process, where it is performed, or how it is performed, the process itself and any information generated during the course of a peer review process is private, confidential, privileged, and not subject to discovery, except under very limited circumstances.

### II. How is a "peer review process" initiated?

Based upon the intent and purpose of protecting the process, the decision as to how a peer review process is initiated is left up to the healthcare facility. Although it is clearly not required by this new section of law, the date and time of process initiation should be properly documented. This provides a concrete point of reference which can be used by the Court in determining whether the information in question is protected by the privilege. The process may be continuous, or it may be limited to a specific occurrence, procedure, healthcare professional, or patient depending on the individual practices of each healthcare facility.

### III. What is "peer review information"?

Peer review information means **all** records, documents, and other information **generated during the course** of a peer review process. Such information includes **any** reports, statements, memoranda, correspondence, record of proceedings, materials, opinions, findings, conclusions and recommendations which have been created during the course of the process. Consequently, if the information sought to be discovered was previously created outside the peer review process it does not fall within the definition.

Once a peer review process commences, all information generated during the process is peer review information, even if generated by independent consultants or others as part of the process.

With this in mind, it was decided to establish a specific and limited list of information that is not "peer review information". This was an attempt to assist in resolving any discovery disputes which might arise in the course of litigation.

### IV. What is not "peer review information"?

The new statute identifies seven very specific and limited categories of information that are not peer review information.

> " **a. The medical records of a patient whose healthcare in a healthcare facility is being reviewed.**[3]

This exception is intended to make it clear that the medical records of the patient cannot be withheld upon a claim of "peer review privilege."

> **b. Incident reports and other like documents regarding healthcare services being reviewed, regardless of how the reports or documents are titled or captioned.**

An incident report or other like document is generally a form document filled out by a nurse or hospital employee to make note of an event or incident affecting a patient during the course of treatment and which may warrant further inquiry. Generally, the completed forms include a brief written description of what the individual witnessed during the course of the patient's medical care and treatment. They contain factual information involving or affecting current care or treatment and are generally not written as "after-the-fact" evaluations or reviews of care previously provided. If prepared, incident reports regarding the patient's healthcare services being reviewed cannot be withheld upon a claim of "peer review privilege."

The intent of this exception is to provide patients with factual information regarding their care and treatment at a healthcare facility which may not be recorded in the patient's medical chart.

> **c. The identity of any individuals who have personal knowledge regarding the facts and circumstances surrounding the patient's healthcare in the healthcare facility.**

The patient may discover the identity of individuals who have personal knowledge of the facts. For example, if prior to the initiation or during the course of a peer review process, individuals with personal knowledge of the patient's healthcare are discovered, the healthcare facility may not withhold the identity of these individuals upon a claim of peer review privilege. The individuals identified must possess personal knowledge. The statute does not exclude from the definition of "peer review information" the identity of individuals who possess information obtained from secondary sources or as hearsay.

> **d. Factual statements regarding the patient's healthcare in the healthcare facility from any individuals who have personal knowledge regarding the facts and circumstances surrounding the patient's healthcare, which factual statements were generated outside the peer review process.**

In the event an individual with personal knowledge is asked to provide or voluntarily provides a written or recorded statement about a patient's healthcare prior to the initiation of a peer review process, such written or recorded statement is subject to discovery. This exception is consistent with the general principle expressed by this new law that the plaintiff should have access to previously created factual information.

> **e. The identity of all documents and raw data previously created elsewhere and considered during the peer review process.**

This exception is limited to disclosing the identity of these documents and raw data and does not require the production of the actual documents and raw data. The documents and raw data to be identified must have been previously created elsewhere and considered during the course of the peer review process. Documents and information created during a peer review process need not be identified under this provision, even if created elsewhere.

> **f. Copies of all documents and raw data previously created elsewhere and considered during the peer review process, whether available elsewhere or not.**

This exception requires the actual production of copies of all documents and raw data created prior to the initiation of a peer review process and considered during the peer

review process. The intent of this provision was to provide the patient with one set of documents that were created prior to the commencement of a peer review process, gathered from various locations, and assembled for presentation during a peer review process.

This alleviates the plaintiff's concern with obtaining copies of documents that may no longer exist, but does not create a separate duty to consider these documents and raw data during the course of a peer review process or maintain copies of these documents and raw data in peer review files. For example, if a patient's medical chart is retrieved from a hospital's medical records department, reviewed as part of a peer review process, and returned to the medical records department, it would be subject to discovery under this provision (as well as the medical records exclusion), but a separate copy of the medical chart need not be maintained in a peer review file.

> **g. Credentialing data regarding the healthcare professional who provided the healthcare services being reviewed or who is the subject of a credentialing process.**

The definition of a "peer review process" includes a "credentialing process." Thus it is important to understand the concept of a credentialing process and the nature of the information and documents that are gathered or created during the course of a credentialing process.

A "credentialing process" is defined as any process, program or proceeding utilized by a healthcare facility to assess, review, study or evaluate the credentials of a healthcare professional. Unlike a peer review process, which involves the credentials, competence, professional conduct, and patient care activities of a healthcare professional, a credentialing process is limited to the evaluation of credentials of a healthcare professional and is merely one type of peer review process.

A variety of information is generated during the course of a credentialing process, and is, therefore, "peer review information." However, certain items of information generated during a credentialing process are defined as "credentialing data." Those four items are: (a) the application submitted by a healthcare professional requesting appointment or reappointment to the medical staff of a healthcare facility or requesting clinical privileges or other permission to provide healthcare services at a healthcare facility; (b) any information submitted by the healthcare professional in support of such application;(c) any information, unless otherwise privileged, obtained by the healthcare facility during the credentialing process regarding such application; and (d) the decision made by the healthcare facility regarding such application.

Unlike other information and documents gathered or generated during the course of a credentialing process, these four items constituting "credentialing data" are not privileged and may be subject to discovery in the appropriate cases. Further, whether any credentialing data so discovered will be admissible as evidence is to be determined by the Court.

### V. What does "shall be private, confidential, and privileged" mean?

The information is private, not public. It means the information may not be obtained from a healthcare facility by any person and it is not subject to discovery by subpoena or other means of legal compulsion in the course of litigation, unless specifically provided by the exceptions stated in the new law.

Whether and to what extent a voluntary or unintended waiver of the privilege can take place and the effect of any such waiver is an issue that is not specifically addressed in the statute, but will be decided based upon general principles of law. It is perfectly appropriate for the trial court to enter any protective order necessary to enforce the

statute's public policy in order to limit the use or dissemination of any information released or obtained pursuant to statute or by voluntary or unintended waiver.

### VI. When can a healthcare facility release peer review information?

The statute identifies four situations in which a healthcare facility can release peer review information:

1. A healthcare facility can release relevant peer review information to a state agency or board that licensed the healthcare professional. Thus, the statute permits healthcare facilities to cooperate with state licensing agencies and boards in their official functions. The statute requires the healthcare facility to give notice to the healthcare professional prior to release of information.

2. In a situation where a patient or the patient's legal representative files a lawsuit against a healthcare professional for negligent provision of healthcare services occurring in a healthcare facility, certain **factual statements**[5] presented during the course of a peer review process will be subject to discovery, but only under the following circumstances:

A. The alleged negligence by the healthcare professional must have occurred in the healthcare facility,

B. The factual statements, whether written, recorded or oral, must have been presented during a peer review process,

C. The factual statements must be made by an individual with personal knowledge of the facts and circumstances surrounding the patient's healthcare, and

D. The plaintiff must make an affirmative showing that such statements are not otherwise available in any other manner.[6]

3. If a patient or the patient's legal representative files a civil action and alleges that he or she suffered injuries resulting from negligence by a healthcare professional in providing healthcare services in a healthcare facility, the following would be subject to discovery pursuant to the Oklahoma Discovery Code:[7]

A. Recommendations made as a result of any peer review process utilized by such healthcare facility regarding the healthcare professional prior to the date of the alleged negligence, and

B. Action taken as a result of any peer review process utilized by such healthcare facility regarding the healthcare professional prior to the date of the alleged negligence.[8]

4. In any civil action in which a patient or patient's legal representative has alleged that the healthcare facility was independently negligent as a result of permitting a healthcare professional to provide healthcare services in the healthcare facility, the following would be subject to discovery pursuant to the Oklahoma Discovery Code:

A. Recommendations made as a result of any peer review process utilized by such healthcare facility regarding the healthcare professional prior to the date of the alleged negligence, and

B. Action taken as a result of any peer review process utilized by such healthcare facility regarding the healthcare professional prior to the date of the alleged negligence.8

### VII. Are there any restrictions on the admissibility of information discovered under the new statute?

Except as specifically provided, peer review information is not subject to discovery and is not admissible as evidence in any civil action. The Oklahoma Discovery Code and Oklahoma Evidence Code will govern the discovery and admissibility of non-peer review information and information referred to in subsection C of the new statute.

Subsection D is intended to address what has commonly been referred to as *Strubhart* liability.9 This relatively new cause of action imposes a duty upon a hospital to use ordinary care such that incompetent doctors are not granted clinical privileges. *Strubhart* also imposes a duty on a hospital to take action to prevent harm to patients when it knew or should have known that a doctor had established a pattern of incompetent behavior.

Any information discovered pursuant to subsection D will not be admissible as evidence until a judge or jury has found the healthcare professional to have been negligent in providing healthcare services to the patient in such healthcare facility.10

Recommendations made and actions taken as a result of any peer review process regarding the medical care and treatment which may be the subject of a malpractice action are **not** discoverable under any circumstances. This provision was intended to promote candid and frank discussion among those individuals participating in a peer review process. The fear that these self-critical deliberations may be used in a malpractice action or adversely affect their ability to work in the interest of quality patient care is alleviated.

### VIII. Can anyone be forced to or voluntarily choose to disclose peer review information?

The new law specifically prohibits any person involved in a peer review process from releasing peer review information. This means that any healthcare professional who is a member of a peer review committee while a peer review process is being conducted and any healthcare professional who participates in the peer review process cannot be forced to testify or respond to written discovery requests seeking information regarding the peer review process.11 Nor can any healthcare professional who is a member of the committee voluntarily disclose peer review information by testifying in a deposition or trial about what occurred during the peer review process or any information that was generated during the course of the process.

This evidences a strong and important statement of the public policy behind this new law. Whatever information is generated during the course of a peer review process is to be protected from disclosure and not used for any purpose in any legal proceeding. Otherwise, the improved quality of care that results from conducting these processes would be jeopardized.

### Conclusion

Oklahoma's new peer review statute is the result of many hours of negotiation in an attempt to balance the interest of a patient to find out what happened during the course of medical care and treatment and a healthcare professional or facility's interest in conducting peer review activities in a private, confidential, and privileged setting in order to evaluate and continually improve the care provided to patients. It contains strong statements of public policy while allowing a patient to obtain factual information that was previously available for the purposes of a peer review process. While both sides of the debate had to compromise, it was firmly believed this new section of law would improve the quality of medical care for all Oklahomans.

---

1. *Strubhart v. Perry Mem. Hosp. Trust*, 1995 OK 10, 903 P.2d 263 (creating a new cause of action against hospitals for corporate negligence); *Wisdom v. McCall*, 1998 OK 31, 956

P.2d 155; *Rigsby v. Lanning*, No. 91,149, (ordering the production of the requested documents, records, etc., prepared or generated pursuant to any "peer review" or other investigation done by the hospital concerning the care and treatment of the plaintiffs); *Starkey v. Blevins*, No. 92,756, (ordering defendant hospital to produce incident report sought in plaintiff's motion to compel); and *Funderburk v. Peterson*, 1999 OK 37,(after in camera inspection, judge directed to allow discovery of those materials that pertain to the credentialing and peer review activities affecting the named physician and declaring that materials tending to show facts that were known and knowable about the doctor's level of skills were discoverable). **The author expresses his gratitude to fellow Coalition team member Michael E. Joseph of McAfee & Taft for his contributions to this article.**

2. Although a peer review process generally involves a review of treatment provided by a healthcare professional, there will be times when nursing care and hospital care is reviewed and discussed in the context of a peer review process. Findings, mental impressions, and conclusions regarding the quality of care provided by nursing, technical, and ancillary personnel will also be protected.

3. During the course of a peer review process the medical records of other patients who have previously or subsequently been treated by the healthcare professional in question may be reviewed. The new law does not allow the identity of patients other than the plaintiff to be disclosed. To interpret any part of the new statute to allow disclosure of this information would violate a patient's right to have his or her personal medical history remain private and protected by the patient-physician privilege.

4. One of the fundamental principles agreed to was that both parties to the litigation have access to the facts surrounding a patient's medical care. An analogy used often throughout the negotiations was that both sides should have the pieces to the puzzle. This is not to say that either side has to tell the other how to put the puzzle together.

5. The term "factual statements" as used in subsection C, is intended to mean a description of an event, whether it be an oral, written, or recorded description of that event. The description is limited to such matters as who was involved, what happened, when it happened, and where it happened. Any references as to why it happened or expressions of opinion as to whether it should or should not have happened are not factual statements and may not be disclosed.

6. The burden is on plaintiffs to show they cannot obtain the same information in any other manner. In all but the rarest situations, this same information can be obtained during the course of a deposition by asking the witness what happened, etc. However, if the witness is no longer available and a written or recorded statement is available, it may be subject to discovery.

7. Where the doctor is the only defendant at trial, any prior peer review recommendations made or actions taken as a result of any prior peer review process will not be admissible in the plaintiff's case in chief. However, if the doctor is found to be negligent, this information could be admissible in a punitive damages phase of the trial if the court determined it was relevant to show a pattern of past conduct.

8. Recommendations are not the same as findings and conclusions. Findings are comparable to a jury's findings of fact. They are arrived at after confidential deliberations. Conclusions are based upon these findings of fact. Recommendations are made in response to conclusions. An example of a finding would be: Dr. Z ordered 500 mg of drug A. An example of a conclusion would be: 500 mg is 100 times the maximum dose of drug A. A recommendation made at the conclusion of the peer review process would be: We recommend that Dr. Z have his privileges revoked. Whatever action the Hospital Board takes in response to that recommendation would also be subject to discovery.

9. The new statute balances patients' interests in accessing information about the doctor who treated them and the need to conduct a peer review process in a confidential and privileged setting. The intent of this provision is to allow a plaintiff to ascertain whether or not he or she has a case against the hospital based on a corporate negligence theory before actually naming the hospital as a defendant in the lawsuit. Discovery is limited to prior recommendations and actions taken by the governing board of the hospital in response to these recommendations because they are the only way a hospital could

have potentially prevented the instant case. The patient's attorney can then make a determination as to whether the hospital could have taken some earlier action to prevent the alleged negligence from ever occurring in the first place.

10. The new statute requires a bifurcated proceeding by the trial court. In the first phase of the trial a jury or judge considers evidence relevant to the question of whether or not the doctor was negligent in treating the patient on the date in question. Under *Strubhart*, if the doctor is found negligent, the second phase of the trial is commenced. If the jury or judge determines the doctor was not negligent there is no second phase because the question of alleged corporate negligence in credentialing, supervision, or retention is rendered moot.

In the circumstance where a doctor is found negligent in the first phase of the trial, the question of when and how to assess damages is one left to the Court's discretion. Special steps will have to be taken to ensure the doctor is not unfairly prejudiced at the time damages are assessed because information not heard by the jury in first phase of the trial will presumably be presented in the second phase.

11. This would not prevent the healthcare professional sitting on the peer review committee to testify about his or her personal knowledge of the patient's medical care and treatment in the healthcare facility or their own prior or subsequent care and treatment of the patient.

MARTY G. CAIN received both his BA in Public Administration and Juris Doctor from the University of Oklahoma. His firm, Cain & Cain P.L.L.C., is located in Norman. Mr. Cain is on the board of directors of the Coalition for Quality Patient Care, Inc. He counsels healthcare associations, facilities, professionals, and staffs on legal issues affecting healthcare with an emphasis on helping develop and conduct effective peer review processes. He formerly practiced with the firm of Perry, Rife, Walters, Sullivan & Cain in Oklahoma City where he defended medical malpractice actions on behalf of doctors and hospitals.

Copyright © 1998–2013 Oklahoma Bar Association
1901 N. Lincoln Blvd., Oklahoma City, OK 73105
Phone: 405-416-7000; Fax: 405-416-7001

Contact Us
Our site disclaimer

Depressed? Addicted? Feeling out of control?
Call the Lawyers Helping Lawyers Hotline 24 hours a day.

**1-800-364-7886**

Free. Confidential. Helpful.